UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MEENA CHANDOK, PH.D., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5:05-1076 |
| | ) | |
| v. | ) | |
| | ) | |
| DANIEL KLESSIG, PH.D | ) | |
| | ) | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | ) | |

** ** ** ** **

This matter is before the Court on two Motions for Summary Judgment. The first Motion considered herein is Defendant Klessig's Motion for Summary Judgment on Plaintiff Chandok's defamation claim. [Record No. 19]. The Court will also consider Plaintiff's Motion for Summary Judgment on Defendant's counterclaim under New York's statutory provision allowing recovery to the victims of Strategic Lawsuits Against Public Participation ("SLAPP"). [Record No. 23]. Responses and replies having been filed, these matters are ripe for review.

BACKGROUND

A. **Statement of Facts**

In July of 2000, Plaintiff, Dr. Meena Chandok, was offered a position at Boyce Thompson Institute ("BTI") to perform biochemical research. Dr. Chandok began work for BTI in November of 2000 for a 2-year appointment. Dr. Chandok was assigned to assist Dr. Daniel Klessig, who directed Dr. Chandok to research plant immune

responses.  Specifically, her initial work was to identify which individual proteins could be responsible for Nitric Oxide Synthase, or NOS, from a list of possible proteins.  To perform this work, each protein must be isolated, replicated, and tested.  In the fall of 2002, Dr. Chandok reported that she had identified the Varient P, or "VarP," protein as having NOS activity.  She confirmed this report with additional data on October 20, 2002.  This was considered a significant discovery in the field of plant biology. Dr. Klessig and Dr. Chandok began work on a paper to publish the results.[1]  Dr. Klessig requested that Prof. Brian Crane, a researcher of animal NOS activity who was familiar to Dr. Klessig, attempt to confirm Dr. Chandok's results.  Prof. Crane assigned the work to Mr. Pant, a doctoral student who was already performing similar work.  Dr. Chandok worked with Mr. Pant to reproduce the results, which was reported as a success.  At that time, Dr. Klessig seemed satisfied with this verification, and the paper he and Dr. Chandok completed was submitted to *Cell* for publication. The paper was published in the Spring of 2003.

In 2003, Dr. Kim was hired and assigned to verify Dr. Chandok's work.  Dr. Klessig applied for and received a federal grant to further explore NOS and varP.  Also in 2003, Dr. Chandok began applying for positions at other institutions.  Dr. Klessig wrote letters of recommendation for Dr. Chandok's applications.

---

[1]    This would become the *Cell* paper.

Dr. Chandok collaborated with Dr. Susan Ekengren to research disabling the NOS response from varP. Dr. Chandok and Dr. Ekengren sought publication for this work and succeeded. Their research was published in the *Proceedings of the National Academy of Sciences* ("*PNAS*").[2]  Shortly thereafter, Dr. Klessig began to increase efforts to verify Dr. Chandok's results. He assigned Dr. Kim to this project, and later added Drs. Lee and Wang to the effort.

In the spring of 2004, Dr. Chandok secured employment in Maryland. She submitted a letter of resignation to BTI on March 30th, and her last day with BTI was April 12. At this time, Drs. Kim, Lee, and Wang had still had not duplicated Dr. Chandok's results. After Dr. Chandok left BTI, Dr. Klessig and Lucy Pola, Human Resources director at BTI, sent a letter to Dr. Chandok stating that her results still had not been duplicated. The letter requested that Dr. Chandok return to BTI to assist in verifying her results and indicated that, should she fail to return, Dr. Klessig would begin a scientific misconduct investigation and withdraw support for her visa application. [Ex. 35.] Dr. Chandok did not return to assist in the research. Dr. Klessig initiated the investigation by reporting the possibility of scientific misconduct to Dr. Stern, then President of BTI, and Lucy Pola.

Pres. Stern began an investigation to determine if Dr.

---

[2]    Authorship was attributed to Dr. Chandok and Dr. Ekengren, with Dr. Ekengren's director, Dr. Gregory Martin, listed as a co-author.

Klessig's suspicions that Dr. Chandok falsified some of her research were meritorious.[i] Dr. Klessig contacted Dr. Crane, who provided additional information, but Dr. Klessig indicated that it was insufficient and "the evidence still argues that she falsified at least some of the data."[3] After reviewing the data, Dr. Stern concluded that the investigation should go forward and formed a committee. Dr. Klessig sent an email agreeing with Dr. Stern.[4] Then, Dr. Klessig submitted several suggested phrasings of an allegation of scientific misconduct to the BTI investigation committee.[5] Dr. Susan Ridley from the National Science Foundation and Dr. James Anderson from the National Institute of Health, the relevant federal agencies to whom scientific misconduct should be reported, were next notified by Dr. Klessig.[6] Dr. Klessig then began discussing the phrasing of the retraction letter that would be sent to *Cell* magazine and *PNAS*. Several drafts were suggested to Pres. Stern, Ms. Pola, Dr. Ekengren, and Dr. Martin.[7] Once a final form was agreed upon, it was sent to the editors of *Cell* and *PNAS* as the formal retraction.[8]

      Dr. Klessig went on to announce the retraction at a lecture at

---

[3]    This is the first allegedly defamatory statement (hereinafter, Statement 1). Another statement in the same email, claiming that Dr. Chandok did not have the proper materials to even perform the tests she reported, is allegedly defamatory Statement 23.

[4]    This is the second allegedly defamatory statement (hereinafter, Statement 2).

[5]    These are allegedly defamatory Statements 3 through 6.

[6]    These are allegedly defamatory Statements 7, 8, and 9.

[7]    These are allegedly defamatory Statements 10, 11, and 12.

[8]    These are allegedly defamatory Statements 13 and 14.

the Juan March Conference in October of 2004, citing unreliable data.[9]  Following the lecture, Dr. Klessig sent unsolicited emails to several other colleagues in the scientific community.  First, he notified Jyoti Shah, a former associate of his who was working on similar research, and warned her of the retraction, again citing unreliable data.[10]  Similar emails were sent by Dr. Klessig to Dr. Priti Krishna, a former supervisor of Dr. Chandok's in India, and Dr. Nigel Crawford, a colleague performing similar research.[11]  Dr. Klessig also informed Allen Collmer and Rose Loria, both of Cornell University, which is the campus on which BTI is located.[12]  After a month of relative silence on the subject, Dr. Klessig was interviewed by John Travis, a reporter for *Science* magazine, and in that interview he described the *Cell* paper's data as "shaky" and "unreliable."[13]

In January of 2005, Dr. Klessig emailed the BTI investigatory committee and again stated that he concluded Dr. Chandok had falsified data.[14]  Later that same month, Dr. Klessig re-asserted to the same BTI committee that the evidence gathered through the investigation indicated that Dr. Chandok had falsified data.[15]  At roughly the same time, Dr. Klessig worked with Bridget Coughlin, an

---

[9]     This is allegedly defamatory Statement 15, and is the only spoken statement among those alleged.
[10]     This is allegedly defamatory Statement 16.
[11]     This is allegedly defamatory Statement 17.
[12]     This is allegedly defamatory Statement 18.
[13]     This is allegedly defamatory Statement 19.
[14]     This is allegedly defamatory Statement 20.
[15]     This is allegedly defamatory Statement 21.

editor for *PNAS,* to determine the best way to phrase the retraction notice in the publication.[16]

On August 26, 2006, Plaintiff Chandok filed the instant action, alleging defamation by Defendant Klessig, her former supervisor.  Defendant raised ten defenses in his Answer. [Record No. 8].  The tenth such "defense" was actually a counterclaim under N.Y. C.L.S. Civ. R § 70-a, which permits defendants to file a SLAPP suit to counterclaim for damages.  *Id.*  Through the course of discovery, Plaintiff identified twenty-three allegedly defamatory statements. [Record No. 19, attch. 2].  Defendant Klessig moved for Summary Judgment on the defamation claim.  Plaintiff Chandok moved for Summary Judgment on Defendant's SLAPP counterclaim.  Both motions are now before this court for decision.

**B. List of allegedly defamatory statements**

For ease of reference, the Court will continue to employ the statement numbering system used by the parties, and will refer to the allegedly defamatory statements as follows:[17]

> Statement 1: To Brian Crane, via e-mail
> "Unfortunately, the evidence still argues that she falsified at least some of the data on the recombinant varP." Ex. 84 at 3; Ex. 85.

> Statement 2: To Lucy Pola, Dr. Martin, and possibly Pres. Stern, via e-mail

---

[16]    The first suggested phrasing of this retraction statement is allegedly defamatory Statement 22.

[17]    All statements were made by Defendant Klessig, with the exception of Statement 22, which was an e-mail from Bridget Coughlin to Nick Cozzarelli.

"I absolutely agree that there MUST be an investigation regardless of whether varP has NOS activity or not, given the evidence of falsification." Ex. 55.

<u>Statement 3</u>: To Pres. Stern and Lucy Pola, via interoffice memorandum
"The conclusion we draw from these results is that most or all of the data that Meena presented to us and in the *Cell* paper concerning the recombinant varP has been falsified." Ex. 51.

<u>Statement 4</u>: To Pres. Stern and Lucy Pola, via interoffice memorandum
"The conclusion I draw from these results is that most or all of the data that Meena presented to us and in the Cell paper concerning recombinant varP may have been falsified." Ex. 88.

<u>Statement 5</u>: To Pres. Stern and Lucy Pola, via interoffice memorandum
"The conclusion I draw from these results is that most or all of the data that Dr. Chandok presented to us and in the Cell paper concerning recombinant varP is likely to have been falsified." Ex. 53.

<u>Statement 6</u>: To Pres. Stern, Lucy Pola, Dr. Blissard, Dr. Granados, and Dr. Winans, via memorandum
"The conclusion I draw from these results is that most or all of the data that Dr. Chandok presented to us and in the Cell paper concerning the recombinant varP is likely to have been falsified." Ex. 54.

<u>Statement 7</u>: To Dr. James J. Anderson, via letter
"Evidence recently emerged that strongly suggests that she falsified most or all of the data on recombinant varP.... In contrast, the evidence that Dr. Chandok falsified most or all of the recombinant varP data is much clearer and therefore, warrants investigation." Ex. 58.

<u>Statement 8</u>: To Dr. Susan Ridley, via letter
"Evidence recently emerged that strongly suggests that she falsified some of the data showing that the recombinant variant P gene of Arabidopsis encodes a nitric oxide synthesizing enzyme (NOS)." Ex. 59.

<u>Statement 9</u>: To Pres. Stern, Lucy Pola, Dr. Ekengren, and Dr. Martin, via written document

-7-

"Further experiments by other members of the Klessig laboratory revealed difficulties in reproducing the results with recombinant variant P and, in addition, suggest that the data on the recombinant variant P presented in the *Cell* paper is being retracted....For this reason and the fact much of the data in this paper are now suspect.... The experiments that produced this data were performed by M. Chandok." Ex. 96.

Statement 10: To Pres. Stern, Lucy Pola, Dr. Ytterberg, and Dr. Van Wijk, via written document
"Further experiments by other members of the Klessig laboratory reveal difficulties in reproducing the data with recombinant variant P and in addition suggest that the data on recombinant variant P presented in Tables I and 2 and Figures 5B and C of this paper are unreliable. An investigation is underway to determine whether these data were fabricated by the lead author." Ex. 97.

Statement 11: To Pres. Stern, Lucy Pola, Dr. Ytterberg, Dr. Van Wijk, and Dr. Marcus, via written document
"Further experiments by other members of the Klessig laboratory reveal difficulties in reproducing the data with recombinant variant P and in addition suggest that the data on recombinant variant P presented in Tables 1 and 2 and Figures 5B and C of this paper are unreliable. An investigation is underway to determine whether these data were fabricated by the lead author." Ex. 98.

Statement 12: To Dr. Ekengren and Dr. Martin, via written document
"Further experiments by other members of the Klessig laboratory reveal difficulties in reproducing the results with recombinant variant P and, in addition, suggest that the data on the recombinant variant P and in addition suggest that the data on recombinant variant P presented in the *Cell* paper may have been fabricated by the lead author – hence the *Cell* paper is being retracted.... For this reason and the fact we are no longer confident in much of the data in this paper..... The experiments that produced this data were performed by M.R. Chandok and are now suspect." Ex. 99.

Statement 13: To Dr. Ekengren, and Dr. Martin, via written document
"Since the publication of this paper, other members of the Klessig laboratory have been unable to repeat the results with recombinant variant P. In addition, other

discrepancies have come to light that suggest data on the recombinant variant P presented in the *Cell* paper may have been fabricated by M.R. Chandok – hence the *Cell* paper is being retracted.... For this reason and the fact that we are no longer confident in much of the data in this paper.... The experiments that produced this data were performed M.R. Chandok are now suspect." Ex. 100.

Statement 14: To Ian T. Baldwin, via e-mail
"Over the past 6-8 months several new postdocs have ben following up on the NOS work started by Meena Chandok. The have had difficulties reproducing the results with recombinant variant P and, in addition, have obtained evidence suggesting that the data on recombinant variant P presented in the Cell paper may have been fabricated – hence the Cell paper is being retracted. The follow-up PNAS paper is also suspect and will very likely be retracted." Ex. 102.

Statement 15: To audience at Juan March Conference on October 6, 2004, via spoken statement
"Since publication of this work in *Cell* in 2003, several new postdocs have joined our group to study varP or the pathogen-inducible NOS. To date, they have not been able to repeat the results with the recombinant variant P that were reported. In addition, other discrepancies have very recently come to light that strongly suggest that the data on the recombinant variant P is unreliable." Ex. 103.

Statement 16: To Jyoti Shah, via e-mail
"Over the past several months several new postdoc [sic] in our group have attempted to reproduce Meena Chandok's results with recombinant varP to study its NO synthesizing activity. They have been unable to demonstrate this activity. In addition, several other discrepancies have come to light in the past several weeks which strongly suggest that the data on the recombinant varP reported in our 2003 Cell paper are unreliable. Therefore, we are retracting the Cell paper. The follow-up PNAS paper is also being retracted because we are no long [sic] confident in much of the enzymological data in this paper." Ex. 104.

Statement 17: To Nigel Crawford and Priti Krishna, via e-mail
"Over the past several months several new postdoc [sic] in our group have attempted to reproduce Meena Chandok's

-9-

results with recombinant varP to study its NO synthesizing activity. They have been unable to demonstrate this activity. In addition, several other discrepancies have come to light in the past several weeks which strongly suggest that the data on the recombinant varP reported in our 2003 Cell paper are unreliable. Therefore, we are retracting the Cell paper. The follow-up PNAS paper is also being retracted because we are no long [sic] confident in much of the enzymological data in this paper." Ex. 105.

Statement 18: To Allen Collmer and "Rose," via e-mail
"Over the past several months several new postdoc [sic] in our group have attempted to reproduce Meena Chandok's results with recombinant varP to study its NO synthesizing activity. They have been unable to demonstrate this activity. In addition, several other discrepancies have come to light in the past several weeks which strongly suggest that the data on the recombinant varP reported in our 2003 Cell paper are unreliable. Therefore, we are retracting the Cell paper. The follow-up PNAS paper is also being retracted because we are no long [sic] confident in much of the enzymological data in this paper." Ex. 106.

Statement 19: To John Travis, reporter for *Science* magazine
Quoted in article as having informed reporter for *Science* magazine that the data was "shaky" and "unreliable." Ex. 107.

Statement 20: To BTI, Dr. Blissard, and Dr. Wang, via e-mail
"With this additional data it is very hard to avoid the conclusion that she falsified at least some of her results with recombinant varP." Ex. 108.

Statement 21: To Dr. Blissard and Dr. Wang, via e-mail
"Therefore, her results with recombinant AtvarP protein made in baculovirus expression system had to be falsified because she could not have made the protein." Ex. 109.

Statement 22: Bridget Coughlin to Nick Cozzarelli, via e-mail
"Dr. Klessig has contacted me about retracting his paper (attached). It appears that the first author, a former post doc in his lab, fabricated the data and spiked the samples to indicate iNOS activity." Ex. 110.

Statement 23: To Dr. Crane, via e-mail
"varP is unreliable.  Because I don't believe she ever
had the recombinant version."  Ex. 111.

## JURISDICTION

The Court finds that it has jurisdiction to hear both claims. At the time the Complaint was filed, Dr. Chandok had established domicile in Maryland and Dr. Klessig was still domiciled in New York.  This, combined with the allegation of damages in excess of the amount in controversy, is sufficient to establish a complete diversity of parties as is required by 28 U.S.C. § 1332. Furthermore, since the court has jurisdiction over the defamation claim, it necessarily has jurisdiction over the compulsory counterclaim.  Ruling on the SLAPP claim is ultimately bound to the analysis of the same facts and law as the defamation claim, and the interests of judicial economy and convenience strongly favor use of a single court for both claims.  There does not appear to be a particularly strong state or local interest in this claim. Accordingly, this Court will hear the counterclaim.

## STANDARD OF REVIEW

Under federal law, summary judgment is appropriate if, after adequate time for discovery, the moving party can show that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(b)(c).  The movant does not need to actively negate an element

-11-

of the nonmovant's case, but instead it is sufficient if the movant shows that an essential element of the nonmovant's case has suffered a "complete failure of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). In determining if there is a genuine issue of material fact, the court must resolve all doubts and construe all inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986)(citing *United States v. Diebold, Inc.*, 369 U.S. 654 (1962)). If there is more than one reasonable inference, the matter must go to a jury. *See Scott v. Harris,* 550 U.S. 372 (2007). Additionally, the substantive standard of proof must be taken into account. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "A mere scintilla of evidence" would be insufficient, but instead there must be sufficient evidence "on which the jury could reasonably find for the [nonmoving party]." *Id*. Accordingly, summary judgment is appropriate if no issue of material fact remains after all reasonable inferences are taken in favor of the nonmovant and the analysis of all relevant material facts and inferences would entitle the movant to judgment as a matter of law.

### DEFAMATION CLAIM

## A. Elements of a defamation claim

Plaintiff Chandok has filed an action to recover damages for defamation. Defamation, which is commonly divided into the

categories of libel and slander, is a factually false publication which "tends to expose the plaintiff to public hatred, contempt, ridicule, or disgrace." *Kimmerle v. N.Y. Evening Journal*, 262 N.Y. 99, 102 (1933)(citing *Sydney v. Macfadden Newspaper Pub. Corp.*, 242 N.Y. 208 (1926)). To establish a claim of defamation under New York law, a Plaintiff must establish 1) that the statement averred was defamatory; 2) that the statement was published by the defendant; 3) that the statement was communicated to a party who was not the plaintiff; and 4) the resultant injury to the plaintiff. *James v. DeGrandis*, 138 F.Supp. 2d 402, 415-16 (W.D.N.Y. 2001). Here, Plaintiff has averred 23 statements as defamatory, each of which must satisfy these basic elements of a defamation claim.

Under New York law, it is for the Court to decide whether, given the overall context of the publication, a statement is reasonably susceptible to a defamatory meaning. *Levin v. McPhee*, 119 F.3d 189, 195 (2d Cir. 1997). Courts have identified several factors to consider in determining whether a statement is reasonably susceptible to a defamatory meaning, including viewing the publication as a whole and in context, without isolating discrete phrases. *James v. Gannett Co.,* 40 N.Y. 415, 419 (1976). Additionally, the allegedly defamatory statements must be construed as they would be by the average reader, not with the exacting precision one would expect from a lawyer or judge. *November v.*

*Time, Inc.,* 13 N.Y.2d 175, 179 (1963).  In the instant case, Plaintiff argues that each of the twenty-three statements are susceptible to the defamatory meaning that Plaintiff is unfit or unethical in her profession.

### B. Statements susceptible to defamatory meaning

Each of the twenty-three statements is reasonably susceptible to a defamatory meaning.  Defendant argues that Statements 2 and 9-19 do not concern Plaintiff, but simply the "results" or "data" obtained through Plaintiff's research.  The Court disagrees. Statements 2 and 9-19 are centered around the results of Plaintiff's research, and that fact that, despite numerous attempts, no other scientist was unable to replicate Plaintiff's results.  The individuals to whom Defendant published Statements 2 and 9-18 were members of the scientific community, many of whom collaborated with Plaintiff on the NOS research and attempted to replicate the results.  While a member of the general population may not understand Statements 2 and 9-19 to refer to a particular individual's work, the individuals to whom these Statements were published certainly might.

Among the allegedly defamatory statements are Defendant's comments that "there MUST be an investigation . . . given the evidence of falsification," [Statement 1], that there were "difficulties in reproducing the data," [Statement 11], that other scientists "have been unable to repeat the results," [Statement

13], and that the data was "shaky" and "unreliable." [Statement 19].  The scientifically sophisticated individuals to whom these Statements were communicated could very well understand the references to falsification, difficulty reproducing data, and an investigation to be a statement that some, i.e., Plaintiff, falsified or fabricated her research.  Upon reading these communications in full and giving consideration to the context in which they were sent, the Court finds that Statements 2 and 9-19 could reasonably be considered to be susceptible to a defamatory meaning.

**C.  Statements of opinion**

In addition to its numerous and varied provincial elements, defamation also embodies constitutional concerns.  Statements of opinion are neither actionable under New York law, nor under the U.S. Constitution.  *Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235, 239 (1991).  Defendant argues that each of the twenty-three Statements are protected as opinion statement, requiring an award of summary judgment in his favor.

In determining if a statement is an opinion, a court must consider 1) whether the statement has a precise meaning or is ambiguous, 2) whether the statement is capable of being proven true or false, and 3) whether the statement, when taken in the context of the entire document or the social context of the circumstances, would "'signal . . . readers or listeners that what is being read

or heard is likely to be opinion, not fact.'" *Gross v. New York Times Company*, 82 N.Y.2d 146 (1993)(quoting *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 289 (1986)(quoting Ollman v. Evans, 750 F.2d 970, 983 (1984))).

A statement accompanied by a recitation of facts from which it is supposedly derived is either a statement of "pure opinion" or of "mixed opinion." *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 289 (1986). A statement is a pure opinion if, *inter alia*, it is accompanied by a recitation of the facts upon which the statement is based and does not imply or assert the existence of any undisclosed facts unknown to the audience. *Id.* However, if the statement is accompanied by assertions that it was based on facts that are not disclosed and unknown to the audience, then the statement is actionable as a mixed opinion. *Id*. If the recitation purports to be all the facts on which the decision was based, then it affords the audience an opportunity to evaluate the opinion, including whether the recited facts were sufficient to warrant it.

Defendant argues that the Statements are protected as opinion. While he concedes that each of the Statements did not fully recite the facts upon he based his opinion, he argues that because they were published to an audience already familiar with the relevant facts, republication to the entirety of the facts was not required. The Court notes Defendant's argument, but finds it unnecessary to decide this Motion on those grounds, as the Court will grant

summary judgment in favor of defendant because Plaintiff, a public figure, has failed to meet the heightened burden of proof required of a public figure.

**D.  Plaintiff is a limited issue public figure**

The tort of defamation is intended to make a speaker internally consider the otherwise external ramifications of making false statements to the public that might harm another person.  By design, it encourages a "self-censorship" of speech.  This has a practical effect of limiting speech which, in turn, hinders the operation of the free marketplace of ideas that the constitutional freedom of speech is intended to buttress.  Under the First and Fourteenth Amendments to the Constitution, speech is a protected right that cannot be removed by operation of state law.  U.S. CONST., amend I;  U.S. CONST., amend XIV.  This creates a conflict where the courts must weigh a person's individual interest in protecting his reputation against society's interest in fostering free speech.  *See Barger v. Playboy Enterprises*, 564 F. Supp. 1151, 1153 (N.D. Cal. 1983) (citing *Service Parking Corp. v. Washington Times Co.*, 92 F.2d 502, 505-06 (D.C. Cir. 1937)).  The Supreme Court, in considering this conflict, articulated additional elements and altered standards of proof in cases involving public figures or public issues.  There is no established route to becoming a public figure, and no simple definition exists for when a plaintiff is sufficiently "public" as to be divested of the full

protection of the defamation tort.  *See Tavoulareas v. Piro*, 817 F.2d 762 (D.C. Cir. 1987); *Rosanova v. Playboy Enterp., Inc.,* 411 F.Supp. 440, 443-44 (S.D. Ga. 1976), *aff'd*, 580 F.2d 859 (5th Cir. 1978).

The first and foremost consideration in determining whether Plaintiff is a limited issue public figure, is Plaintiff's degree of voluntarily involvement in the public controversy.  *James v. Gannett Co.*, 40 N.Y.2d 415, 422 (1976). ("[t]he essential element underlying the category of public figures is that the publicized person has taken an affirmative step to attract public attention").  Generally, a party may not be made a public figure through the unilateral acts of another.  *See Hutchinson v. Proxmire*, 443 U.S. 111 (1979).  There is no question that Dr. Chandok has met this requirement.  Scientific articles are inherently subject to robust criticism, and for good reason.  Dr. Chandok has chosen and worked diligently in furtherance of a career where, through publication, entry into controversy and debate is expected and even required as a matter of course.  She cannot be said to have entered the public arena haphazardly or otherwise in the absence of her own volition.  Furthermore, Dr. Chandok published the scholarly papers at the core of this lawsuit and is credited as the lead author thereof, a designation that she has defended vehemently.  In her own deposition, Dr. Chandok admits that she is well known within the plant biology community. [Chandok Dep., Vol 1, pp. 36-37.]  The

controversy, with regard to a published article, extends not only to its direct subject matter and conclusion, but necessarily to the competence and integrity of the author. The real issue in the instant case falls to whether the plant biology community is sufficiently "public." This court finds that it is.

The magazines *Cell* and *PNAS* reach an international audience, albeit a specialized one. All communities within the human set have an effective limit of scope beyond which their defining aspects do not effectively extend. While this scope is familiarly based in geography, it is not required to be. *See Celle v. Filipino Reporter Enterprises, Inc.*, 209 F.3d 163, 177 (2d. Cir. 2000)(radio commentator is a public figure within the Filipino-American community, which is a specialized subset of a larger community). The scope of a community can also be defined by profession, e.g., a community comprised of plant biologists. *See Daniel Goldreyer, Ltd. v. Dow Jones & Co.*, Inc., 259 A.D.2d 353 (N.Y.A.D. 1 Dept., 1999)(plaintiff was well known within his profession, but not outside of it). Dr. Chandok has willfully interjected herself into a public controversy by way of creating the very subject of the controversy, and the controversy and community are sufficiently public to invoke the constitutional protection of free speech. In few other spheres is the need for a free marketplace of ideas as indispensable to the very operation of the endeavor as it is to scientific research. The public good

-19-

would be ill-served by the interjection of such a murky field of law. This Court finds that Dr. Chandok is a limited issue public figure and that Plaintiff must establish the additional elements of 1) falsity with convincing clarity, 2) actual malice with convincing clarity, and, beyond a preponderance of the evidence, 3) some degree of fault.

Actual malice is defined as knowledge of falsity or reckless disregard for the truth. *New York Times*, 376 U.S. at 254. Plaintiff failed to establish with convincing clarity that Defendant was aware of the falsity of any Statement, or that he recklessly disregarded the truth or falsity of any Statement.[18] Each of the twenty-three Statements somehow references the inability of numerous scientists to duplicate Plaintiff's result and the implications thereof. As evidence that Defendant knew the Statements were false and acted with actual malice in publishing them, Plaintiff cites a letter from Defendant to the INS, in which Defendant admitted that the postdoctoral students assigned to attempt to replicate Plaintiff's results were inexperienced and initially did not follow the correct protocol. A conclusion that Defendant had actual malice is not warranted.

While Defendant may have admitted that the postdoctoral

_____

[18] In fact, Plaintiff never contends that Defendant's comments that numerous other scientists were unable to duplicate Plaintiff's results are false. Plaintiff does not appear to take issue with the factual portions of the Statements, only with the veracity of Defendant's conclusions as to the implications of those facts - that if numerous other scientists could not replicate the results, the original results must have been fabricated or falsified.

students assigned to duplicate Plaintiff's results had less experience that Plaintiff, that in no way evidences - and certainly not with convincing clarity - that Defendant was aware of the falsity of any of the Statements. The Statements were based on data provided by three recent doctoral graduates, and made after investigation by three senior researchers following a standardized protocol. Plaintiff argues, in a somewhat conclusory manner, that Defendant's ill-will prompted him to make statements with knowing falsity. However, Plaintiff has not alleged any such motive for the list of individuals who agreed with Defendant's assessment. It is not a reasonable inference that the existence of data was substantially false or that Dr. Klessig knew that it was false, or certainly that the references to such data were made with reckless disregard for the truth. The plaintiff cannot, as a matter of law, establish this beyond a standard of clear and convincing evidence and, as such, Defendant is entitled to summary judgment.

Similarly, while Plaintiff attempts to paint Defendant's actions in reporting the failure of the replication studies and going about the business of retracting the *Cell* paper as evidencing Defendant's actual malice toward Plaintiff, those actions do not provide clearly convincing evidence of actual malice. Defendant reported the discrepancies and the failure to reproduce the results, as he was required to do. He invited Plaintiff back to BTI to attempt to replicate the results herself or to more

thoroughly explain how she arrived at her results, something her sparse lab notebooks failed to do.  Defendant gave Plaintiff every opportunity to help explain the inability of other scientists to duplicate her work, efforts that are far from a clearly convincing showing of actual malice.

Because Plaintiff has failed to present clearly convincing evidence that Defendant was aware of the falsity of the Statements, or that he acted with actual malice, the Court will grant summary judgment in favor of Defendant on the defamation claims.

### SLAPP COUNTERCLAIM

Dr. Klessig filed a counterclaim under the relevant New York SLAPP statutes.  These statutes require, for the basic elements of a SLAPP counterclaim, 1) there must be a public application or petition, 2) the public applicant or permittee of that application must file a lawsuit against a person who is "materially related to any efforts of the defendant to report on, comment on, rule on, challenge or oppose such application or permission," and 3) that the lawsuit must be, at a minimum, substantially without merit.  NY CLS Civ R § 70; NY CLS Civ R § 76.

As applied to Dr. Klessig's claim, the SLAPP suit would require that the grant proposal seeking federal funds be a public application or petition, that Dr. Chandok is a public applicant with regard to that application, and that Dr. Klessig's notification of possible scientific misconduct is an attempt to

"report on, comment on, rule on, challenge or oppose" that grant application.  If all of these basic prerequisites were met, the cause of action would be available if Dr. Chandok were to file a sufficiently meritless suit against Dr. Klessig.  However, Dr. Klessig's allegations, even if taken as true, fail to meet the prerequisites.

There is no public application or petition.  The defining aspect of a public application or petition, is that it is a required government process that must be satisfied to perform some other task.  *See Harfness v. Sea Gate Assoc., Inc.*, 647 N.Y.S.2d 329, 331 (Sup. Ct. N.Y. County, 1995).  Receipt of a grant may certainly assist in conducting research, but research can proceed without this specific grant.  *Harfness* itself found that requests for money, without other restrictions, are not public applications.  *Id.*  As there is no public application, there can neither be a public applicant nor a commentator to the same.  Accordingly, there is no cause of action under the SLAPP statute.

### CONCLUSION

Accordingly, and for the foregoing reasons, **IT IS ORDERED**:

(1) That Defendant Klessig's Motion for Summary Judgment [Record No. 19] shall be, and the same hereby is, **GRANTED**;

(2) That Plaintiff's Chandok's Motion for Summary Judgment [Record No. 23], shall be, and the same hereby is, **GRANTED**;

(3) That all other pending motion shall be **DENIED AS MOOT**; and

(4)  That  all  scheduled  proceeding  shall  be  **CONTINUED**

**GENERALLY.**

This the 27th day of August, 2009.

Sitting by designation,



Signed By:
_Joseph M. Hood_
Senior U.S. District Judge